IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SYLVIA CANDELARIA,

     Plaintiff,

v.                                         No. 10-CV-726 JEC/DJS

MET LIFE INSURANCE COMPANY

     Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Plaintiff's Motion to Reverse ERISA LTD Insurer's Benefit Termination,* filed November 19, 2010 (Doc. 20) ("Motion"), and Defendant's *Opposition to Plaintiff's Motion to Reverse ERISA Determination and Cross-Motion for Summary Judgment on MetLife's Claim for Reimbursement*, filed January 14, 2011 (Doc. 40) ("Response").  Having reviewed the pleadings, the administrative record, the governing authority, and being otherwise fully informed, the Court will grant Plaintiff's Motion in part such that the case will be remanded to the plan administrator for further findings, and deny the Motion in part as to Plaintiff's request for entry of judgment in her favor.  Defendant's Cross-Motion will be denied as moot**.**

## I.    Background

This case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.  Plaintiff, Sylvia Candelaria, was employed by CitiCards as a telephone collector.  Through this employment, Plaintiff participated in a disability insurance plan ("Plan"), issued and administered by MetLife Insurance Company ("Defendant").  Plaintiff

received both short-term disability ("STD") and long-term disability ("LTD") benefit payments until May 15, 2009, when Defendant determined that she no longer qualified as disabled under the Plan.  Defendant appealed through the administrative process provided under ERISA, and Defendant denied Plaintiff's appeal on November 17, 2009.  On June 28, 2010, Plaintiff timely filed a complaint in New Mexico state court, alleging a breach of the Plan, and Defendant removed the action under ERISA to this Court on August 3, 2010.

###### A.        Approval of STD Benefits

In the summer of 2008, Plaintiff began to experience severe, chronic headaches, and on July 18, 2008, she ceased work upon the advice of Dr. Montoya, her primary care physician.  Administrative Record ("AR")[1] at 275.  Plaintiff was approved for STD benefits on August 14, 2008, retroactive to July 18, 2008, the day after her last work day, through August 7, 2009.  AR 270.  On August 22, 2008, Dr. Dvorak, a family practitioner, informed Defendant that he had treated Plaintiff for chronic severe headaches, phonophobia and photophobia, that she had a suboccipital block performed by Dr. Wagner, a pain management specialist in his office, and that she was unable to work.  AR 216-217.  Defendant approved STD benefits through September 22, 2008, "based on ongoing severity of [of headaches] with photo/phono phobia..." and "need for ablation treatment as well as ongoing use of narcotic pain med[ication] which would preclude even sedentary work."  AR 223.  On September 22, 2008, Dr. Dvorak again advised Defendant that Plaintiff was unable to return to work due to persistent and constant headaches, rendering her unable to concentrate, and photophobia and phonophobia.  AR 226-227.  Defendant extended

---

[1] The Administrative Record in this case consists of a claim file, which contains 301 pages in numerous volumes, and is designated by the Court as the AR without reference to volume, CitiGroup's Benefit Plan for LTD Benefits, designated by Plaintiff as Policy, and CitiGroup's summary plan description, designated by Plaintiff as SPD.

her STD benefits through October 5, 2008.  AR 230.  Defendant subsequently attempted to

obtain medical information from Dr. Wagner but was unsuccessful.  AR 232-236.  On October

22, 2008, Dr. Montoya informed Defendant that he was handling Plaintiff's treatment because

Dr. Wagner "will not," and Dr. Dvorak was not currently practicing.  AR 237.  Dr. Montoya

agreed to provide Defendant with Dr. Wagner's records of the occipital blocks performed on

Plaintiff on October 6 and 13, 2008.  AR 237.

On October 28, 2008, Dr. Montoya diagnosed Plaintiff with depressive disorder and

intractable variant migraines, noting a long history of migraines with an acute worsening since

July.  AR 113.  Dr. Montoya added that Plaintiff's pain specialist had sent her for interventional

approaches and wanted to "do a [radio frequency] ablation of her cervical group," but that she

needed to extend her disability to get the procedure done.  *Id.*  On October 28, 2008, Defendant

determined that the ongoing severity of functional impairment qualified Plaintiff for benefits

through October 16, 2008, the maximum time allowed for her STD benefits.  R. 241-242.  In its

claim activity log, Defendant noted that "based on the ongoing severity of pain," there was "need

for change in prophylactic medication and cervical branch block; time for therapeutic effect to

be achieved; [and] medical [follow-up] for reeval[uation] with possible radio-frequency ablation

procedure to be done, if no relief from injection therapy."  AR 242.  Defendant added that "[i]t is

reasonable to expect that ongoing severity of pain with [history] of cervical muscle tightness and

photophobia would preclude [employee] from safely performing her job until reeval[uation] for

effectiveness of new treatment is completed."  *Id*.  The file was then transitioned for review of

LTD benefits.

### B.    Initial Approval of LTD Benefits

On October 30, 2008, after review by nurse and vocational rehabilitation consultants,

Defendant determined that Plaintiff qualified for LTD benefits, and identified Plaintiff's

potential candidacy for a radio-frequency ablation procedure, should injection therapy fail, and

the need to obtain clinical examination findings for review.  AR 245-246.  By letter of November

4, 2008, Defendant informed Plaintiff that she was approved for LTD benefits.  AR 178.  The

letter quotes the Plan's definition of long term disability as follows:

> ... [C]lass I  ... 'Disabled' or 'Disability' means that, due to sickness,
> pregnancy or accidental injury, you are receiving Appropriate Care and Treatment
> from a Doctor on a continuing basis; and
>
> a.  during your Elimination Period and the next 24 month period, you are unable to earn
> 80% of your Pre-disability Earnings at your Own Occupation for any employer in your
> Local Economy;
>
> b.  after the 24 month period, you are unable to earn more than 60% of your Indexed
> Predisability Earnings from any employer in your Local Economy at any gainful
> occupation for which you are reasonable [sic] qualified taking into account your training,
> education, experience and Predisability Earnings.

AR 174.

> The same letter also states:
>
> If you remain out of work until January 18, 2009, you are required to apply for Social
> Security Disability Insurance (SSDI) benefits.  When you apply for SSDI benefits, please
> request a receipt of application and mail a copy to our office.

AR 175.

Defendant also enclosed a number of forms in the letter, including documents entitled

*Personal Profile and Employee Statement* ("Statement")*, Authorization to Refer Me to a Law*

*Firm for Assistance in Pursuing Social Security Insurance Benefits* ("Authorization"),

*Metropolitan Life Insurance Consent for Release of Social Security Information* ("Consent"),

and a *Long Term Disability Reimbursement Agreement* ("Reimbursement Agreement"), for

Plaintiff to complete and return by November 20, 2008.  AR 178-197.

4

On November 12, 2008, Dr. Montoya diagnosed Plaintiff with chronic, intractable migraines and reactive depression to chronic pain, observing that she had failed injections and medication modifications, was "narcotic dependent," and crying throughout the exam.  AR 114. Dr. Montoya stated that he could not predict long term disability until Plaintiff had a "pain procedure" at New Mexico Pain and Wellness, and that he did not add new medication "since most had failed."  *Id*.

On or about December 16, 2008, Plaintiff returned the forms she received from Defendant, including her Statement that she suffered from headaches and neck pain due to osteoarthritis, had to force herself to walk and do things in the dark due to pain, and needed help with personal needs and grooming.  AR 161-162.  Plaintiff also stated that she couldn't return to work, even with an accommodation, because she was having a hard time focusing due to extreme pain.  AR 163.  Plaintiff returned a signed Reimbursement Agreement in which she agreed to apply for SSD benefits and provide Defendant with "proof" of having done so; appeal a denial of her SSA claim; and reimburse Defendant in a single lump sum payment for any overpayment made to her due to the integration of retroactive SSD benefits.  AR 160.  No medical records were included with the forms Plaintiff returned.  AR 159-177.

### C.    Investigation of Plaintiff's Continued Eligibility for LTD Benefits

On December 29, 2008, Plaintiff informed Defendant that she was still "not doing better," that the Botox injection she had received to treat her headaches did not "hit the right area," and that she was "going to pursue a lawsuit against Dr. Wagner as all [he] is having her do is taking pain killers."  AR 8.  On that date, Defendant faxed a *Physician Questionnaire* ("Questionnaire") to Dr. Montoya requesting records from Plaintiff's last three visits with him. AR 155-158.  On January 3, 2009, Dr. Montoya returned the Questionnaire, diagnosing Plaintiff

with "migraine intractable" and a secondary diagnosis of depression, and stating she could not

function or concentrate, was taking narcotics continuously, and could not tolerate florescent

lights or computer screens.  AR 151.  Dr. Montoya further opined that he could not estimate a

return to work date, and that a functional capacity evaluation ("FCE") needed to be performed as

well as clearance by a pain specialist.  AR 151-152.  No medical records were attached to the

returned Questionnaire.  AR 155-158.   In January and April of 2009, Defendant faxed

questionnaires to Dr. Wagner inquiring about treatment, but received no response, despite stating

that failure to respond could impact Plaintiff's disability benefits.  AR 146, 128.

At some point during the claim administration, Plaintiff applied for SSDI benefits and on

February 26, 2009,  Defendant contacted Plaintiff to discuss the status of her SSD claim.  AR

140.  On March 9, 2009, the Social Security Administration ("SSA") notified Plaintiff of its

conclusion that she was disabled and entitled to monthly benefits in the amount of $1,319.00,

commencing on March 13, 2009, and retroactive to January 2009.  AR 135.  No other documents

from the SSA appear in the administrative record.

On March 22, 2010, Dr. Montoya authored a letter stating that Plaintiff was unable to

come to his office on a routine basis because of her inability to drive when experiencing acute

flare-ups, but that they were in close phone contact and he was able to manage her chronic

condition by phone.  AR 251.  Defendant then received notice of Plaintiff's SSA award on April

9, 2009.  AR 69.  The  next day, by letter dated April 10, 2009,  Defendant informed Plaintiff

that her claim would be closed unless it received a completed questionnaire and records from Dr.

Wagner.  AR 132.  On April 16, 2009, Defendant notified Plaintiff that it was in receipt of

"Social Security Disability Award Information," which resulted in an "overpayment of [her]

claim in the gross amount of $3,957.00," that it was reducing her monthly payment in the future

6

to offset the SSDI payments,  and was withholding future benefits until full reimbursement was received.  AR 124.  On April 27, 2009, Plaintiff arranged to reimburse Defendant for the overpayment by having money withheld from her ongoing LTD payments.  AR 15.

### D.     Termination of LTD Benefits

By letter dated May 15, 2009, Defendant notified Plaintiff that her LTD claim was terminated effective May 16, 2009 because it had not received Dr. Wagner's medical records.  AR 119.  Defendant informed Plaintiff that "[y]our employer's plan states that benefits are payable until the date you fail to comply with the request of the insurance company," and since Defendant "had not received a response from you nor received the requested information, [it] was closing the file."  *Id.*  Plaintiff was then advised of her right to appeal.  *Id.*

On May 28, 2009, Plaintiff informed Defendant that she had not received the letter requesting Dr. Wagner's records and was no longer being treated by Dr. Wagner.  AR 17-18.  On May 29, 2009,  Dr. Montoya notified Defendant that he was treating Plaintiff for intractable migraine headache syndrome, and that she "suffers from a daily headache pattern and requires medications to relieve her symptoms, has been disabled from her employment due to the headaches and remains under the same restrictions regarding her ability to pursue gainful employment."  AR 101.

On June 2, 2009, Plaintiff apprised Defendant of an appointment she had scheduled with a new neurologist, Dr. Barrett, later that month.  AR 19.  On June 6, 2009, Dr. Montoya faxed Defendant his records from his latest three office visits with Plaintiff: October 28, 2008, November 12, 2008 and April 2, 2009.  AR 112-116.  Dr. Montoya's record from April 2, 2009 stated that while Plaintiff was experiencing daily headaches, she was "more functional, [had a] better sleep pattern, [was] taking a regimen of pain meds and anti depressants that [were]

helpful," and that she had "significant improvement with percocet for pain relief" and her depressive disorder was "better on cymbalta."  AR 115.

On June 8, 2009, after review by a nurse consultant, Defendant determined that the medical information provided by Dr. Montoya did not "support the severity of [Plaintiff's] condition preventing a [return to work]," emphasizing the lapse in time between her November and April visits with Dr. Montoya and the fact that Plaintiff showed "significant improvement" during her last office visit.  AR 23.  On June 11, 2009, Defendant asked Dr. Montoya to "clarify medication and [restrictions and limitations]," and on June 16, 2009, Dr. Montoya responded that Plaintiff had intractable headaches and was being treated by other providers, but that he could not give specifics and Defendant would need to ask Plaintiff about it.  AR 26-29.   Defendant did not contact Dr. Montoya to discuss further, determining instead that the medical information it had "did not support a severity of condition that would prevent [Plaintiff] from performing the sedentary duties of her own job."  AR  24-30, 106-107.   Although Defendant recognized Plaintiff's pending appointment with a new neurologist, it stressed that she had minimal visits with Dr. Montoya, had not seen any other providers since October of 2008, and had not mentioned symptoms of photophobia, phonophobia, nausea and dizziness during her last doctor's visit.  AR 030.

By letter dated June 16, 2009, Defendant notified Plaintiff that it was upholding its decision to terminate her LTD benefits because there was "no updated medical to support an ongoing severity of functional limitations preventing [her] from returning to [her] own sedentary level occupation at this time."  AR 106-107.  Defendant relied on the following reasons: "Dr. Montoya indicated significant improvement and better mood " during his last office visit with Plaintiff, there was "no other information from any other visit, no physical exam or discussion of

8

continued limitations caused by [Plaintiff's] condition or symptoms such as photophobia, nausea and dizziness" and "no medical to support that assessment," and Dr. Montoya was under the belief that Plaintiff was being seen by other providers but Plaintiff had informed her case manager that she was only being treated by Dr. Montoya. *Id*. Defendant added that it had "taken into consideration [Plaintiff's] SSDI award when making its claim determination" but that an "award of SSDI benefits does not guarantee the approval or continuation" of LTD benefits as the "Social Security Administration's ["SSA"] determination is separate from and governed by different standards than Defendant's review and determination pursuant to the terms of [her] employer's plan." AR 107. Plaintiff was then advised that Defendant would review any additional information that she cared to submit, including negative exam findings and post operative complications, and of her right to appeal. *Id*.

By letter dated June 22, 2009, Dr. Montoya apprised Defendant that he was "not qualified to disable [Plaintiff] from her occupation and that she need[ed] a full functional capacity evaluation from her pain clinic to decide on her work limitations," but that given the amount of medication Plaintiff used daily, the "side effects for gainful employment are challenging." AR 105. Dr. Montoya stated that based on the conversations he had with Plaintiff, and in his experience, "[Plaintiff] will not be able to perform regular employment duties with the amount of physical and emotional changes she has experienced in her health." *Id*. Dr. Montoya added that from a primary care standpoint, he was refilling Plaintiff's pain medications at a standard quantity per month, did not have to see her more than bi-annually at that point, and that further information regarding her chronic headaches and cervical spasms should be obtained from her specialist at the pain clinic. *Id*.

On June 23, 2009, Defendant determined that despite the correspondence received from

Dr. Montoya the day before, there was still a lack of medical support for ongoing LTD benefits.

AR 33.  Defendant stressed the fact that Plaintiff had ceased treatment with other providers, even

though Dr. Montoya maintained that she was treating with a pain management specialist and

continued to prescribe pain medication contrary to "standard practice once someone is receiving

care from a pain management provider."  *Id.*  Defendant concluded that the new information did

not support overturning its decision to terminate benefits.  R. 34-35.  On June 24, 2009,

Defendant advised Plaintiff that it was not changing its determination and that she could appeal.

*Id.*  On August 6, 2009, Defendant requested reimbursement from Plaintiff in the amount of

$3,852.21 for the overpayment she received as a result of the retroactive benefits from the SSA.

AR 102.  Defendant explained that since Plaintiff's claim was closed effective May 15, 2009,

she had no future benefits to apply toward the balance that she owed.  *Id.*

### E.    Plaintiff's Administrative Appeal

On August 25, 2009, Plaintiff submitted an appeal to Defendant, stating that she "wished

to appeal the decision to terminate her LTD benefits... due to the fact that [her] illness [was]

more severe."  AR 36, 41, 91-101.  She wrote that her pain had increased, causing her to be in

bed more frequently and in a darkened environment in order to alleviate the pain, that her driving

was affected by dizziness and nausea, and that the constant use of different medications only

seemed to ease her pain for a short time.  *Id.*  Plaintiff resubmitted the medical records from her

visits with Dr. Montoya.  AR 91-101.

On September 14, 2009, Defendant asked Plaintiff whether she was being treated by

other providers, and Plaintiff advised that she was not, but that she was trying to get into

rehabilitation to alleviate her neck pain.  AR 40-41.  On September 19, 2009, Plaintiff informed

Defendant in an interview that she had been seen by Dr. Wagner and Dr. Bridges, who

determined that she had a "bone in her neck sticking out" and osteoarthritis.  AR 43.  Plaintiff

agreed to provide Defendant with MRI test results and other information regarding the

osteoarthritis and bone in her neck.  AR 44.  Defendant requested that Plaintiff send the test

results by September 29, 2009, because it would be "beneficial for [her] appeal."  R. 086.  On

September 30, 2009, Defendant informed Plaintiff that it would toll her claim until November

16, 2009, to  allow her additional time to obtain and submit the requested information, reminding

her that it would benefit her appeal.  AR 44, 90.  Plaintiff then informed Defendant that her

appointment with a neurologist was scheduled for November 16, 2009.  AR 45.

On October 1, 2009, Defendant received Plaintiff's MRI records and a referral for her to

see a physical therapist for neck pain/strain twice a week for four weeks.  AR 46, 88-89.

Defendant noted that the impression from the MRI of August 28, 2007 indicated no thyroid

abnormality, but that an area seen posterior to the right lobe of the thyroid could represent a

parathyroid adenoma, and masses were identified within the superior neck just inferior to the

chin.  *Id*.  The record of that MRI also stated that a CT scan of the neck was recommended for

further evaluation of the neck mass.  Defendant then noted that impression from the MRI of

August 20, 2008, identified spondylitic findings associated with the reversal of the normal

lordosis, most notably at C-4-C-5-C-6 and C-6-C-7, that did not critically encroach on the

central canal.  *Id*.

On October 7, 2009, Plaintiff informed Defendant that she was not having another MRI

until mid-November and wanted to proceed with her appeal based on what was on the record.

AR 47.  Defendant contacted Plaintiff to discuss the fact that it did not have an evaluation from

Dr. Wagner, and that Dr. Montoya was deferring to the pain specialists.  *Id*.  Plaintiff reiterated

that she was not going to be seen until November 17, 2009 and did not want to wait that long.

11

AR 48.  Plaintiff asked Defendant if she should get more testing and was advised that Defendant could not dictate treatment.  *Id*.  Plaintiff said that she had not been in a lot of treatment because "they told her that they [couldn't] do much for her."  *Id*.  Noting that Plaintiff was crying and upset, Defendant informed Plaintiff that she would have her claim reviewed by a clinical specialist and determine if a doctor review was necessary.  *Id*.

On October 8, 2009, Defendant referred the case to an occupational medical reviewer, who was instructed to "answer questions based on the info[rmation] on file and obtained via the teleconference with [her providers] pertaining to [Plaintiff's] functional abilities, [her restrictions and limitations] and their durations, and any [restrictions/limitations] caused by the meds."  AR 51-52.

### F.     Evaluation by Independent Physician Consultant

Defendant retained an independent physician consultant ("IPC"), Dr. Sheri Phillips, to review Plaintiff's file, make peer to peer teleconferences, and author a summary.  AR 81-84.  In her report dated October 19, 2009, Dr. Phillips answered questions posed by Defendant, responding that the "medical information did not support functional limitations (physical or psychiatric) [for Plaintiff] beyond May 15, 2009," identifying Plaintiff's functional abilities,[2] and opining that Plaintiff's medications may cause her drowsiness so that she be advised not to drive or operate heavy machinery while taking the medications.  *Id*.

Dr. Phillips did not talk to Plaintiff or perform a physical examination before she opined that Plaintiff had no functional limitations beyond May 15, 2009.  *Id*.  Dr. Phillips did speak with

---

[2]Specifically, Dr. Phillips opined that Plaintiff "could perform the following without limitations: sitting 7-8 hrs, bending, reaching, crouching, and stooping, pushing/pulling 5-6 hrs, repetitive use of hands, grasping with the right hand, fine finger dexterity of the right hand 7-8 hrs, use of the head and neck 5-6 hrs and lifting 10 pounds occasionally."  AR 83-84.

Dr. Bridges on October 15, 2009, and learned that he had not treated Plaintiff since October of

2008, and Dr. Wagner had not treated her since December of 2008.  AR 83.  Dr. Bridges told Dr.

Phillips that, since Plaintiff had not been seen by any clinician in their offices during 2009, they

could not speak to Plaintiff's current functionality.  AR 83.  On October 19, 2009,  Dr. Phillips

also spoke with Dr. Montoya, who informed her that Plaintiff had failed interventional pain

control measures and had tried a number of different medicines to no avail.  AR 82-83.  Dr.

Montoya told Dr. Phillips that Plaintiff was receiving medical management for her pain, he was

filling her prescriptions on a quarterly basis, and  "Plaintiff [was] never functional in that her

pain level never decrease[d] and that she [was] depressed and ha[d] difficulty concentrating."

AR 83.  Dr. Montoya added that he had not referred her to psychiatry or counseling as of that

date and that, although she had been diagnosed with intractable migraines, her pain could be due

to some other cause.  *Id*.

In her summary, Dr. Phillips noted Dr. Montoya's concerns regarding Plaintiff's lack of

functionality and difficulty concentrating, but stressed that his last clinical note in the file

described her as "more functional with a better sleep pattern and helpful medication regimen."

AR 83.  Dr. Phillips added that "since that date, there are no records that support subjective,

objective or diagnostic findings of a severity that would indicate that Plaintiff had functional

limitations."  *Id*.  On October 22, 2009, Defendant faxed Dr. Phillips' report to Drs. Montoya,

Wagner and Bridges for comment and advised Plaintiff of the fax, requesting that she contact her

doctors to respond and notifying her that if the providers failed to respond by November 2, 2009,

a determination would be made with the medical information on file.  AR 71-74, 79. The

administrative file contains no response from these doctors to Dr. Phillips' report.

13

### G.      Termination of LTD Benefits Upheld on Appeal

On November 16, 2009, Defendant consulted with a vocation rehabilitation specialist and concluded that Plaintiff would be able to perform her sedentary job with phone work because it did not require driving or operating heavy machinery.  AR 55.  On November 17, 2009, Defendant issued a letter upholding its decision to terminate Plaintiff's benefits.  AR 67-70. Defendant adopted the findings of Dr. Phillips in concluding that Plaintiff did not have an impairment of such severity to preclude her from performing her own occupation.  AR 70. Defendant again acknowledged Plaintiff's receipt of the SSD award, but did not attempt to reconcile that determination of disability with its rationale for terminating benefits, merely reiterating that the SSA's determination is separate and governed by different standards.  AR 69. Defendant stated that on review, "we find that you have failed to satisfy the Plan's definition of Disability and the previous decision to terminate your LTD benefits effective May 16, 2009 was appropriate and remains in effect."  AR 70.

## II.    <u>Legal Standards</u>

### A.      Standard of Review

Under ERISA, plan beneficiaries, such as Plaintiff, have the right to federal court review of benefit denials and terminations.  29 U.S.C. § 1132(a)(1)(B).[3]  Although the default standard of review for denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is *de novo*, when the benefit plan gives the plan administrator or fiduciary the discretionary authority to determine eligibility for benefits or to construe the terms of the plan, that determination is reviewed for

---

[3]The parties agree that the Plan is an employee welfare benefit plan within the meaning of ERISA.  See 29 U.S.C. § 1002.  As such, this Court has federal jurisdiction under 29 U.S.C. § 1132(e)(1).

abuse of discretion.  *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989);

*Trujillo v. Cyprus AMAX Minerals Ret. Plan Comm*., 203 F.3d 733, 736 (10th Cir. 2000).  In the

ERISA context, the abuse of discretion and the arbitrary and capricious standards of review are

interchangeable.  *See Weber v. Gen. Elec. Group Life Assurance Co.*, 541 F.3d 1002, 1010 n. 10

(10th Cir. 2008) (internal citations omitted).  Under the arbitrary and capricious standard of

review, the administrator's decision will be upheld "so long as it is predicated on a reasoned

basis."  *Kimber v. Thiokol Corp.,* 196 F.3d 1092, 1098 (10th Cir. 1999) ("[o]ur review inquires

whether the administrator's decision resides somewhere on the continuum of reasonableness-

even if on the low end.")*; Nance v. Sun Life Assur. Co.*, 294 F.3d 1263, 1269 (10th Cir. 2002) (as

long as the basis for the administrator's decision is reasonable, the decision "need not be the only

logical one nor even the best one").

     A court must look at all of the evidence before the plan administrator in order to

determine if its benefits decision was "the product of a principled and deliberative reasoning

process."  *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. at 105-106, 125 (2008).  The Court in

*Glenn* embraced a "combination of factors method of review" that allows judges to "take

account of several different, often case-specific, factors, reaching a result by weighing all

together."  *Id.*  The Court found that the "combination-of-factors method of review" was

properly applied by the lower court in considering the following factors: the defendant's failure

to reconcile its own conclusion that the claimant could work with the SSA's conclusion that she

could not; the defendant's emphasis on a single report suggesting the claimant could work

contrary to more detailed medical evidence that she could not; the defendant's failure to take into

account evidence indicating that stress aggravated the claimant's condition; and the defendant's

failure to provide all relevant evidence to its independent and vocational experts.  *Id*. at 110.

"All these serious concerns, taken together with some degree of conflicting interests on [the plan administrator's part] led the court to set aside [the] discretionary decision. *Id.* at 107 (finding lower court's decision to be appropriate).

### B.     Evidence Considered

"This Circuit, along with the majority of other federal courts of appeals, has held that in reviewing a plan administrator's decision for abuse of discretion, the federal courts are limited to the administrative record–the materials compiled by the administrator in the course of making his decision." *Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1201 (10th Cir. 2002) (internal quotation marks and citations omitted).  In determining whether the plan administrator's decision was arbitrary and capricious, the district court generally may consider only the arguments and evidence before the administrator at the time it made that decision. *Sandoval v. Aetna Life and Cas. Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992).

### C.     Conflict of Interest

Where a plan administrator has a dual role of evaluating and paying benefits claims, it creates a conflict of interest that is a factor to consider when reviewing a benefits decision for an abuse of discretion. *Glenn,* 554 U.S. at 108.  The relative importance of a conflict of interest depends upon the circumstances in the case and is proportionate to the likelihood that the conflict affected the benefits decision. *Id.*, at 117 (stating that a structural conflict is entitled to greater weight where "circumstances suggest a higher likelihood that it affected the benefits decision" and less weight where the administrator has minimized the risk that the conflict would affect the benefit decision).

### D.     Social Security Disability Determination

An SSA finding of disability does not require a finding of disability under an ERISA

disability plan. *See Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 832-34 (2003)
(critical differences between the Social Security disability program and ERISA benefit plans
caution against SSA presumptions, like importing a treating physician rule, because the two
statutes serve purposes through different means).  However, a plan administrator's failure to
consider a determination of disability by the SSA when making its benefits decision suggests
arbitrary decisionmaking. *Glenn* at 118.  Where a plan administrator instructs an employee to
apply for Social Security disability and reaps the benefits of a successful determination, then
later ignores the evidentiary value of that decision, the inconsistency created is a factor for a
court to consider when reviewing a benefits decision for abuse of discretion. *Id.*  "This course of
events [is] not only an important factor in its own right (because it suggested procedural
unreasonableness), but also would have justified the court in giving more weight to the conflict
(because MetLife's seemingly inconsistent positions were both financially advantageous)." *Id*.
at 119.

The Tenth Circuit requires district courts to factor in such inconsistencies.  *See Brown v.
Hartford Life Ins. Co.*, 301 Fed.Appx. 772, 776 (10th Cir. 2008) (unpublished)[4] (district court
erred in not factoring the inconsistency created by the plan administrator's instructing the
plaintiff to apply for SSD and reaping the benefits of his successful determination, then
summarily rejecting the evidentiary value of the decision almost without comment, into its
determination of whether Hartford acted arbitrarily and capriciously in denying benefits).  The
court in *Brown* stated that "[w]hile authority from this Circuit generally supports the district

_____

[4]Unpublished opinions are not binding precedent. 10th Cir. R.App. P. 32. 1(A). But, like
other non-binding authority, they may be considered for their persuasive value. 10th Cir. R.
32.1(A).

court's approach [of rejecting reliance on Social Security and workers' compensation determinations where disability standards differed from those in private policy], we find the Supreme Court's analysis of similar facts in *Glenn* to be more 'pertinent.'"

### E.     Remand

If the Plan administrator fail[s] to make adequate findings or to explain the grounds for [its] decision, the proper remedy is to remand the case to the administrator for further findings or explanation." *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175-1176 (10th Cir. 2006)(internal quotations omitted).  The Tenth Circuit explained in *Caldwell v. Life Ins. Co. of North America*, 287 F.3d 1276, 1288 (10th Cir. 2002), that a remand for further action is unnecessary only if the evidence clearly shows that the administrator's actions were arbitrary and capricious . . . or the case is so clear cut that it would be unreasonable for the [P]lan [A]dministrator to deny the application for benefits on any ground.  *Id*. at 1288-1289 (internal quotations and citations omitted).  *See Gallo v. Amoco Corp*., 102 F.3d 918, 923 (7th Cir. 1996) (stating that "[t]he remedy when a court or agency fails to make adequate findings or to explain its grounds adequately is to send the case back to the tribunal for further findings or explanation . . . .   This is the appropriate remedy in an ERISA case just as in a conventional appeal."); *Gaither v. Aetna Life Ins. Co.,* 394 F.3d 792, 809 (10th Cir. 2004) (determining that a plan administrator's decision was arbitrary and capricious and subsequently remanding the case to the plan administrator "to reconsider its decision in light of the entire record, and to request and obtain additional documentation if necessary to determine [the claimant's] eligibility for disability benefits.").

### III.     Analysis

The parties agree that Defendant had discretionary authority under the Plan to

determine Plaintiff's eligibility for benefits, that Defendant operated under a structural conflict of interest when doing so, and that a structural conflict is a factor for a Court to consider when reviewing a benefits decision for abuse of discretion.[5]   *See* Motion at 5, Response at 2. Accordingly, the Court applies an arbitrary and capricious standard of review, with consideration given to Defendant's structural conflict as a factor in its review.  *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Glenn,* 554 U.S. at 107.

Plaintiff asserts that Defendant's termination of her benefits was arbitrary and capricious because: all of the medical evidence from her treating physicians demonstrates that she is disabled; Defendant failed to give enough weight to her treating physicians; Defendant hired and relied on a biased physician who did not examine or talk to her when performing a file review; and Defendant failed to use a proper job description or consider the mental requirements of her job when evaluating her disability.

Defendant responds that it reasonably exercised its discretion to terminate benefits because Plaintiff was unable to prove that she was still disabled and receiving appropriate care under the Plan; there was scant medical information to support Plaintiff's claim, despite numerous requests for updated information; and the last medical record showed that her condition had improved.  Defendant also asserts that Plaintiff is precluded from challenging the job description relied on because she did not raise the argument on administrative appeal; that it did, in fact, consider the mental requirements of her position; and that it is entitled to recover $3,750.33 on its counterclaim arising from overpayment of disability benefits to Plaintiff.

---

[5] Plaintiff initially asserted that a structural conflict shifts the burden of proof to Defendant to establish the reasonableness of its decision, but later acknowledged that this burden shifting was overruled in *Metro Life Insurance v. Glenn,* 554 U.S. 105, 116 (2008).  *See* Plaintiff's Reply at 2.

The Court has reviewed all of the evidence before Defendant at the time it terminated Plaintiff's LTD benefits and denied her appeal, and finds that Defendant's decision was not reasonable.  Defendant relied on a single report suggesting that Plaintiff could work, to the exclusion of other, more detailed, medical evidence that she could not, and ignored findings and recommendations made by Plaintiff's treating physician.  Defendant also failed to reconcile its conclusion that Plaintiff could work with the SSA's determination that she could not, and failed to demonstrate that it applied the proper standard for evaluating disability based on the duties of Plaintiff's own occupation.  These facts, along with Defendant's structural conflict of interest, lead the Court to determine that Defendant acted arbitrarily and capriciously when terminating Plaintiff's benefits.

### A.   Defendant's Reliance on Dr. Phillips' Report, to the Exclusion of Other Medical Evidence, was Unreasonable

Since July of 2008, when Plaintiff ceased work, her treating physicians consistently noted the severity of her chronic headaches and resulting symptoms.[6]  None of Plaintiff's treating physicians concluded that Plaintiff could return to work.  Further, the SSA concluded that Plaintiff could not return to work when it awarded her disability benefits on March 9, 2009.  Despite this medical history, Dr. Phillips, a physician who never examined or spoke with

---

[6]*See, e.g.*, AR 217 (August 22, 2008) (chronic severe headaches, phonophobia and photophobia and inability to work); AR 223 (September 22, 2008) (unable to return to work due to persistent and chronic headaches, rendering her unable to concentrate, photophobia and phonophobia); AR 113 (October 28, 2008) (intractable variant migraines); AR 114 (November 12, 2008) (intractable variant migraines and reactive depression to chronic pain); AR 151 (January 3, 2009) (intractable migraine and inability to function or concentrate, taking narcotics continuously and cannot tolerate florescent lights or computer screens); AR 29 (June 16, 2009) (intractable migraines); AR 105 (side effects from amount of daily medication use will make gainful employment challenging); AR 83 (October 19, 2009) (never functional in that pain level never decreases, depression and trouble concentrating).

Plaintiff, opined that Plaintiff was not precluded from returning to work.  Dr. Phillips determined that Plaintiff's medical information did not support functional limitations beyond May 15, 2009, the same date that Defendant terminated Plaintiff's benefits because of her "failure to comply with the insurance company's request" for documentation.  AR 81-84, 119.  Dr. Phillips' confirmation that the medical information does not support a finding of disability beyond this date is concerning because it gives the appearance of a rubber stamp approval.  Dr. Phillips' reliance on Dr. Montoya's April 2, 2009 record as evidence of Plaintiff's "improved condition" is also concerning because Dr. Phillips fails to credit Dr. Montoya's subsequent statements that Plaintiff was never functional, had difficulty concentrating, and may find employment challenging due to her medication.  AR 83.  Although Dr. Phillips acknowledges these statements, she does not meaningfully address them, merely stating that since April 2, 2009, there were no records that supported "subjective, objective or diagnostic findings of a severity that would indicate that Plaintiff had functional limitations."  *Id.*

While a plan administrator is under no obligation to "accord special weight to the opinions of a claimant's physician," an administrator "may not arbitrarily repudiate or refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003); *Glenn*, 461 F.3d 660, 671 (6th Cir.2006).  A medical doctor's statements about a claimant's condition are a specific medical finding even when based on a subjective complaint of the claimant.  *See Washington v. Shalala*, 37 F.3d 1439 (10th Cir. 1994).  In *Holmstrom v. Metropolitan Life Insurance Company*, 615 F.3d 758, 775 (7th Cir. 2010), a physician performing a record review had initially determined that the claimant's disability had not been established, but later retracted this conclusion after reviewing range of motion data, recommending that a clinical examination

be performed to resolve the issue.  The defendant in *Holmstrom* ignored the recommendation, choosing instead to rely on the doctor's earlier conclusion, before the retraction, when denying benefits.  *Id.*   The court held that the defendant's reliance on the record review physician was all the more arbitrary in light of the fact that it decided not to order an examination and failed to explain its decision to ignore the recommendation when terminating benefits.  *Id.*

Dr. Phillips similarly relies on an earlier medical report, overemphasizing the import of this single report as evidence that Plaintiff's condition had improved, and all but ignoring subsequent findings by that same doctor unambiguously stating that Plaintiff is unable to function and is having difficulty concentrating.  The refusal to credit Dr. Montoya's subsequent findings appears all the more arbitrary in light of the fact that Dr. Phillips opines that Plaintiff was able to work as of  May 15, 2009, the date that Defendant chose to terminate her benefits for a different reason.    Defendant's reliance on this report as evidence that Plaintiff was not receiving appropriate treatment is likewise arbitrary in that it ignored, without explanation, Dr. Montoya's statement that he was treating Plaintiff by phone because of her difficulty maintaining a routine schedule due to the severity of her symptoms.  AR 251.  Under these circumstances, Defendant's reliance on Dr. Phillips' single report suggesting that Plaintiff can work, to the exclusion of the other medical evidence in the file, was unreasonable.

**B.      Defendant's Decision to Ignore Medical Recommendations was Unreasonable**

On more than one occasion, Dr. Montoya expressed concern about Plaintiff's ability to concentrate and the effects of her narcotic medication and recommended that a Functional Capacity Evaluation ("FCE") be conducted by a pain specialist to determine the question of disability.  AR 105, 152.  Defendant also acknowledged that the severity of Plaintiff's symptoms and her use of narcotic medication may preclude her from working.  *See, e.g.* AR 223

22

(September 28, 2008) (STD benefits appropriate given severity of symptoms, need for ablation treatment and ongoing use of narcotic pain medication which would preclude even sedentary work);  AR 242 (October 16, 2008) (reasonable to expect that ongoing severity of pain with history of cervical muscle tightness and photophobia would preclude employee from safely performing sedentary work).  Despite these concerns, Defendant disregarded the recommendation that an FCE be performed, choosing instead to have a physician conduct a file review, rather than a physical examination, without explanation.

A plan administrator's decision to ignore recommendations made by treating physicians or to rely on a file review rather than an examination, can raise questions about the thoroughness and accuracy of a benefits decision.  *See Holmstrom,* 615 F.3d at 776 (decision to ignore doctor's recommendation that an independent clinical examination be performed to resolve issue of disability is arbitrary where Defendant relied on that physician's opinion when terminating benefits); *Caldwell v. Life Ins. Co. of  N. Am.*, 287 F.3d 1276, 1289 (10th Cir. 2002) (less deference given where plan administrator failed to gather or examine relevant evidence)*; Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir.2005) (although reliance on a file review is not per se arbitrary, it is another factor to be considered in the overall assessment of the decision-making process); *Adams v. Metropolitan Life Ins. Co.*, 549 F.Supp.2d 775, 790 (2007) (where case involved conflicting medical opinions and subjective accounts stemming from chronic headaches, the fact that the plan administrator chose to have an independent physician conduct a file review rather than a physical examination was relevant to the court's determination).   Under these circumstances, Defendant's decision to ignore the recommendation for an FCE without explanation raises questions about the thoroughness and accuracy of its decision.  *See Holmstrom,* 615 F.3d at 776.

Defendant also failed to thoroughly investigate the effects of Plaintiff's daily use of narcotic medication on her job duties.  Although Dr. Phillips was asked to consider any restrictions or limitations caused by Plaintiff's medications, the record reflects that she only considered the  physical, rather than the mental, requirements of Plaintiff's occupation when advising that Plaintiff not drive or operate heavy machinery.  AR 81-89.  A plan administrator abuses its discretion when it fails to fully consider the effect of the claimant's medication on the capacity to perform his or her own occupation.  *See Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807-809 (10th Cir. 2004) (plan administrator's denial of LTD claim arbitrary and capricious where there was lack of substantial evidence about the extent or effects of uncontroverted use of painkillers);  *Nikola* v. *CNA Group Life Ins. Co.*, 2005 WL 1910905, *8 (N.D. Ill. 2005) (unpublished) (decision to cease paying LTD benefits is subject to reversal because of lack of meaningful analysis of whether claimant's daily use of substantial amount of prescription narcotics rendered him incapable of obtaining and keeping gainful employment); *Pintar v. Liberty Life Assurance Co.*, 2005 WL 1862076, *8 (D.Colo.) (unpublished) (denial of LTD benefits without obtaining further information regarding the effects of plaintiff's use of narcotic pain medication on his mental capacity to perform his own occupation was arbitrary and capricious).

In *Gaither*, the Tenth Circuit held that the plan administrator acted arbitrarily and capriciously when it failed to investigate whether the claimant's use of narcotic medication was disabling before terminating benefits.  *Id*.  The court found that the claimant's failure to provide the plan administrator with additional medical evidence and other evidence to support his claim of disability from narcotics use did not excuse the plan administrator's breach of fiduciary duty to investigate the claim.  *Id*.  "Fundamentally, what was missing in [this] case was a real response to [claimant's] claim to be disabled because of narcotics use."  *Id*. at 808.

24

As in *Gaither*, what is "fundamentally missing" in the administrative record is a "real response" to Dr. Montoya's concerns about the effects of Plaintiff's symptoms and medication use on her ability to be employed. *Id.* Defendant did not conduct a thorough analysis of whether the large amount of pain medication taken by Plaintiff on a daily basis rendered her incapable of being gainfully employed, nor did it address the impact of Plaintiff's symptoms and medication use on her ability to perform the mental requirements of her occupation. Defendant's failure to fully investigate the impact of Defendant's narcotic use and symptoms, along with its decision to ignore recommendations that an FCE be performed, was unreasonable under the circumstances.

### C.  Defendant's Failure to Reconcile Plaintiff's  SSD Award was Unreasonable

Plaintiff has provided evidence that she was approved for SSD benefits. Defendant required Plaintiff to apply for the benefits, reduced her LTD payments because of her SSD award, and then sought reimbursement for overpayment of benefits based on her SSD award. AR 15, 102, 160. After benefitting from the SSA's award of disability, Defendant subsequently failed to reconcile the SSA's determination that Plaintiff could not work with its decision that she could. Although Defendant did reference the SSD award in its letters terminating benefits and denying Plaintiff's appeal, it simply stated that it had considered Plaintiff's SSD award, but that the award does not guarantee approval or continuation of LTD benefits because the SSA is governed by different standards. AR 107. The Tenth Circuit has found that a plan administrator's conclusory reference to an SSA award does not adequately explain the inconsistency in positions. *See Brown*, 301 Fed.Appx. at  776. In *Brown*, although the plan administrator did address the SSA's finding of disability, the Tenth Circuit found its analysis of the finding to be conclusory:

> [W]hen Mr. Brown brought this [SSD] determination to Hartford's attention,
> it merely stated [that] '[w]e also considered the fact that Mr. Brown was
> approved for SSD benefits. The SSD decision is based on specific established

rulings, and is not binding on the Hartford, as we must administer his claim based on our policy language and the medical documentation available to us.' Hartford's discussion of this point was conclusory: it provided no specific discussion of how the rationale for the SSA's decision, or the evidence the SSA considered, differed from its own policy criteria or the medical documentation in rejecting Mr. Brown's claim. A reviewing court should have factored the inconsistency created by Hartford's instructing Mr. Brown to apply for SSD and reaping the benefits of his successful determination, then summarily rejecting the evidentiary value of that determination almost without comment, into its determination of whether Hartford acted arbitrarily and capriciously in denying benefits.

*Brown,* 310 Fed.Appx. at 776 (*Glenn*, 554 U.S. at 107).  *See also Bennett v. Kemper Nat'l Servs. Inc.*, 514 F.3d 547, 553 (6th Cir. 2008) (mere mention of SSA's decision in final determination letter is not the same as a discussion about why the administrator reached a different conclusion from the SSA).

Defendant asserts that the decision to terminate benefits was not inconsistent with the prior award of SSD benefits because Plaintiff's condition had improved subsequent to the award at the time the decision to terminate was made.  However, Defendant first informed Plaintiff that it would close her file if it did not receive Dr. Wagner's medical records the day after it received notice that she qualified for SSD benefits.  AR 69, 132.  Further, as previously noted, Defendant's reliance on this single medical record as evidence that Plaintiff's condition has improved is unreasonable.   There is also no evidence that Defendant analyzed the potential inconsistency in this fashion at the time it upheld its termination of benefits on review, and the Court is limited to reviewing the evidence contained in the administrative file.  Indeed, the record lacks any rationale distinguishing the SSA's decision to grant an award of disability and Defendant's determination to terminate LTD benefits.

Defendant's inconsistent positions with respect to the SSA's determination of disability were not reconciled and were financially advantageous to Defendant, giving more weight to its

structural conflict.  *See Glenn* at 117-118 (the court was justified in giving more weight to the conflict because MetLife's seemingly inconsistent positions were both financially advantageous). Defendant's disregard for the SSA decision, along with Defendant's conflict of interest, supports the Court's determination that Defendant acted unreasonably in terminating Plaintiff's LTD benefits.

### D.    Defendant's Failure to Consider Whether Plaintiff Could Perform the Duties of her "Own Occupation" was Unreasonable

Plaintiff argues that Defendant failed to consider the mental requirements of her job when it determined that she could perform sedentary work.  She attempts to introduce a job description, for the first time, that she claims to be more accurate.  Defendant is correct in asserting that the Court cannot consider the job description because it was not before the plan administrator at the time its decision was made.  *See Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992).  However, Plaintiff is not precluded from arguing that Defendant incorrectly identified her position as sedentary when determining that she was no longer disabled under the terms of the Plan.  Defendant informed her that she failed to satisfy the Plan's definition of Disability, and the ultimate question before this Court is whether Defendant's determination that Plaintiff was no longer disabled under the terms of its Plan was reasonable.

Defendant's Plan language defines "Disability" as a "condition [due to sickness pregnancy or accidental injury] for which you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis," and "during your Elimination Period and the next 24 month period, you are unable to "earn 80% of your Pre-disability Earnings at your Own Occupation for any employer in your Local Economy."  AR 174.  To conclude that a claimant is not disabled under the terms of its Plan, Defendant must determine that he or she was not precluded from performing

his or her "Own Occupation."  AR 24.  The Plan defines "Own Occupation" as the "activity that

you regularly perform and that serves as your source of income.  It is not limited to the specific

position that you held with your Employer.  It may be a similar activity that could be performed

with your Employer or any other Employer."  Policy at 26.  The term "sedentary" does not appear

anywhere in the Plan's definition of "Own Occupation."  Nonetheless, it was a term Defendant

relied on when it determined that Plaintiff was not precluded from performing the duties of her

"own sedentary level occupation."  AR 106-107.  There is no indication in that statement that

Defendant considered the actual duties of Plaintiff's "Own Occupation" when determining that

she was not precluded from performing her "own sedentary level occupation."

Courts have found that plan administrators act arbitrarily when relying on the general

notion of a position, rather than applying the plan language to the actual duties of the job, to

determine a claimant's ability to work.  *See Caldwell,* 287 F.3d 1276, 1283 (10th Cir. 2002)

(relevant standard for 'own occupation' disability is determining whether claimant was capable of

performing his own job)*; Bishop v. LTD Income Plan of SAP America, Inc*., *et al.*, 232 Fed.Appx.

792, 796 (10th Cir. 2007) (unpublished) (failure by plan administrator to consider actual job

duties in defining 'own occupation,' required remand to determine whether travel was essential

job duty for claimant); *Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 618 (proper inquiry is

whether plaintiff could perform own occupation, not whether she is medically able to perform

sedentary work)*; Rohr v. Designed Tele., Inc*., 2009 WL 891739, *11 (S.D. Ohio) (court in error

where it relies on general notion of "sedentary" work and only considered physical requirements

of the job, rather than the most significant aspects of the job, *i.e.*, the intellectual and/or mental

functions.)

Although Defendant determined that Plaintiff was not prevented from returning to her

28

"own sedentary level occupation," based, in part, on Dr. Phillips' conclusion that the medical information did not support physical or psychiatric limitations beyond May 15, 2009, there is no evidence that Defendant analyzed all of the duties entailed in Plaintiff's occupation.  A job description or documentation describing the duties of Plaintiff's occupation is lacking from the administrative record.  The record also lacks any documentation that Defendant considered the mental requirements of Plaintiff's former position, and Defendant did not address whether Plaintiff's symptoms of dizziness, light and sound sensitivity were compatible or incompatible with Plaintiff's ability to perform the duties of her own occupation.  The record reflects that Defendant made a generalized determination that Plaintiff was medically able to perform sedentary work, rather than making the proper inquiry, as set forth by the terms of the Plan, of whether Plaintiff could perform the activities entailed in her own occupation.  Defendant's failure to consider the mental requirements of Plaintiff's former occupation, coupled with the absence of evidence that it applied the proper standard for evaluating disability based on the duties of Plaintiff's own occupation, was unreasonable.

     **E.**       **Remand is Warranted**

     Although the Court finds Defendant's decision to be arbitrary and capricious, this case is not so "clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground."  *Caldwell*, 287 F.3d at 1289.  The shortcomings identified in the administrative record carry more weight because of Defendant's conflict of interest and failure to reconcile the SSA's determination of disability.  However, the Court also acknowledges that Defendant struggled to obtain medical information from Plaintiff and her physicians, and that Dr. Montoya stated he was not qualified to find Plaintiff disabled from her occupation and deferred to physicians that were no longer treating Plaintiff.  Because there is insufficient evidence to

conclude that Plaintiff's migraines prevent her from returning to her job under any circumstances, remand to Defendant is warranted for further investigation into Plaintiff's disability claim in accordance with this opinion.  On remand, Defendant should address Dr. Montoya's findings after April 2, 2009 and recommendation that an FCE be performed by a specialist; identify the duties entailed in Plaintiff's occupation, including the mental and intellectual requirements; provide reasoned analysis of her ability to perform these duties in light of the effects of Plaintiff's medications and symptoms; and address the SSA's determination of disability.  Plaintiff should also be permitted to supplement the administrative record with any new medical evidence regarding her chronic headaches.

### IV.   Conclusion

For the reasons set forth above, the Court determines that Defendant's decision to terminate Plaintiff's LTD benefits was arbitrary and capricious.  Defendant relied on a single report suggesting that Plaintiff could work, to the exclusion of other more detailed medical evidence that she could not, and ignored findings and recommendations made by Plaintiff's treating physician.  Defendant also failed to reconcile its conclusion that Plaintiff could work with the SSA's determination that she could not, and failed to demonstrate that it applied the proper standard for evaluating disability based on the duties of Plaintiff's own occupation.  These factors weigh in favor of finding that Defendant abused its discretion when terminating Plaintiff's LTD benefits.  However, because Defendant's decision was not so "clear cut that it would be unreasonable" for it to terminate Plaintiff's LTD benefits on any ground, remand for further proceedings consistent with this opinion is proper.  *Caldwell*, 287 F.3d at 1289.

WHEREFORE,

**I.    IT IS ORDERED** that *Plaintiff's Motion to Reverse ERISA LTD Insurer's Benefit Termination,* filed November 19, 2010 (Doc. 20) is **GRANTED IN PART** such that the case is hereby remanded to the plan administrator for further findings, and

**DENIED IN PART** as to Plaintiff's request for judgment in her favor**;**

**II.    IT IS FURTHER ORDERED** that Defendant's *Opposition to Plaintiff's Motion to Reverse ERISA Determination and Cross-Motion for Summary Judgment on MetLife's Claim for Reimbursement*, filed January 14, 2011 (Doc. 40) is **DENIED** as moot.

Dated August 29, 2011.

_____
SENIOR UNITED STATES DISTRICT JUDGE

Attorney for Plaintiff:

     Donald D. Vigil
     Albuquerque, NM

Attorneys for Defendant MetLife:

     Ross L Crown
     Marshall J Ray
     Lewis & Roca, LLP
     Albuquerque, NM

     Ann-Martha Andrews
     Lewis & Roca, LLP
     Tucson, AZ